1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2                    SOUTHERN DIVISION

3    **UNITED STATES OF AMERICA,**

4              Plaintiff,

                                    **HON. TERRENCE G. BERG**
5
     v.                             **No. 18-20641**
6
     **TORIANO ADAMS,**
7
              Defendant.
8    _____/

9
                         **SENTENCING**
10
          **BEFORE U.S DISTRICT JUDGE TERRENCE G. BERG**
11        Theodore Levin United States Courthouse
               231 West Lafayette Boulevard
12                   Detroit, Michigan

13             **Tuesday, October 5, 2021**
                       **2:31 p.m.**
14
     APPEARANCES:
15
        For the Plaintiff:      **MARK CHASTEEN**
16                              **RYAN A. PARTICKA**
                                U.S. Attorney's Office
17                              211 West Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                (313) 962-9100
19

20      For the Defendant:      **WILLIAM W. SWOR**
                                500 Griswold Street
21                              Suite 2450
                                Detroit, Michigan  48226
22                              (313) 967-0200

23

24          To Obtain Certified Transcript, Contact:
        Leann S. Lizza, CSR-3746, RPR, CRR, RMR, CRC, RDR
25                      (313) 234-2608

**TABLE OF CONTENTS**

Proceeding                                                      Page

  **Sentencing**                                                  3

    Allocution by Mr. Swor                                       11

    Allocution by Mr. Adams                                      21

    Response by Mr. Particka                                     21

    Ruling                                                       28


Exhibits:                                                   Received

  (None offered.)

SENTENCING

| 1 | October 5, 2021 |
| 2 | Detroit, Michigan |
| 3 | - - - |

4        (Court, Counsel and Defendant present; 2:31 p.m.)

5              THE COURT CLERK:  Please rise.  United States District

6    Court for the Eastern District of Michigan is now in session;

7    the Honorable Terrence Berg presiding.  You may be seated.

8              The Court now calls Case Number 18-20641, United

9    States of America versus Defendant 1, Toriano Adams.

10              Counsel, please place your appearances on the record.

11              MR. PARTICKA:  Good afternoon, Your Honor.  Ryan

12    Particka and Mark Chasteen on behalf of the United States.

13              THE COURT:  Good afternoon, Counsel.

14              MR. SWOR:  Good afternoon, Your Honor.  William Swor

15    on behalf of and with Mr. Toriano Adams.

16              THE COURT:  Good afternoon, Mr. Swor, and good

17    afternoon, Mr. Adams.

18              All right.  Well, today is the date we have set for

19    the sentencing in this case, and let me just explain what's

20    going to happen.  So, Mr. Adams, we're going to have a hearing

21    to determine what your sentence should be in this case, and as

22    part of that, we'll go over your presentence report.  I'll ask

23    you whether you had a chance to review the report with your

24    lawyer and if you have any objections to it or things that need

25    to be corrected in there.  We'll go over with you what your

SENTENCING

```
 1    maximum possible sentence would be in a case like this as well
 2    as what the federal sentencing guidelines are.  I'll also go
 3    over with you what the different factors are that the Court has
 4    to consider when it decides what a sentence should be under
 5    federal law because there are certain factors that I have to
 6    consider.  I'm going to give your lawyer an opportunity to
 7    address the Court and say whatever he would like to say on your
 8    behalf, and then I'll give you an opportunity to address the
 9    Court as well.  Then I'll give the attorneys for the government
10    the same opportunity.  After I hear from everyone, then I'll go
11    through those same factors that I have to consider and I'll
12    indicate what the sentence will be.  Do you think you
13    understand what's going to happen?
14              THE DEFENDANT:  Yes.
15              THE COURT:  All right then.  So let me begin by asking
16    whether you had a chance to go over the presentence report.
17              So, Mr. Swor, did you go over the report with your
18    client?
19              MR. SWOR:  Yes, Your Honor.
20              THE COURT:  And do you have any objections or
21    corrections that you'd like to bring to the Court's attention?
22              MR. SWOR:  I believe all outstanding corrections and
23    objections have been resolved, Your Honor.
24              THE COURT:  All right.  Thank you.
25              And, Mr. Adams, did you also go over the report?
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Did you see anything in there that was

3     wrong or needs to be corrected?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  How about on behalf of the government?

6     Did you go over the presentence report?

7          MR. PARTICKA:  We have, Your Honor, and we have no

8     objections, corrections, or deletions.

9          THE COURT:  Thank you very much.

10          So as you no doubt remember, Mr. Adams, you did enter

11     into a written plea agreement in this case, and under that plea

12     agreement you agreed to plead guilty and you did plead guilty

13     on the record to certain offenses, and that included Counts 1

14     and 2.  Count 1 was conspiracy to commit wire fraud.  Count 2

15     was conspiracy to commit money laundering.  Then there were a

16     number of other aggravated identity theft counts, and those

17     were Counts 17 through 23.

18          So the parties had calculated the guidelines in that

19     plea agreement and they contemplated them to be between 132 and

20     159 months.  And that was based on the guideline range for

21     Counts 1 and 2 which was actually 87 or, rather, 108 to 135

22     months.  But then 24 months had to be added to each of those

23     because your aggravated identity theft counts that you pled

24     guilty to, those carry a mandatory minimum of two years.  So

25     whatever that guideline range is, you have to add on 24 months

6

1    to that, both the bottom and the top.

2         Now, after talking to the attorneys -- I just talked

3    to them a moment ago in my chambers -- the government and your

4    attorney both indicated that they believe that the guideline

5    range here, although you agreed to that higher guideline range,

6    should actually be smaller and so I did want to place that on

7    the record.  And so let's ask the attorneys for the government

8    first to address that.

9         MR. PARTICKA:  Thank you, Your Honor.

10        The Court is largely correct in that recitation.  The

11   government believes that the number scored in the presentence

12   report is accurate as to the total loss attributable to the

13   scheme.  However, upon further review of the evidence, the

14   government is willing to concede as it applies to Mr. Adams

15   and, frankly, all of the defendants who still need to be

16   sentenced that a reasonably foreseeable estimate of the loss

17   that is reasonably foreseeable to each and every individual

18   defendant is two levels lower and falls within the lower range

19   in the loss table.  So for that reason the government would

20   believe that the range that applies to Mr. Adams for this

21   proceeding should be 87 to 108 months on the two substantive --

22   or on the two conspiracy counts followed by the mandatory 24

23   months for an overall range of 111 to 132 months.

24        THE COURT:  All right.  And so in terms of the

25   different loss amounts, the loss amount that you believe should

**SENTENCING**

```
1    be attributable as reasonably foreseeable to Mr. Adams, is that
2    between 1 million and 3.5 million?
3              MR. PARTICKA:  1.5 million and 3.5 million.
4              THE COURT:  1.5 million and 3.5?  And that the amount
5    attributable to the scheme was how much?
6              MR. PARTICKA:  Between 3 and a half million and 9 and
7    a half million.
8              THE COURT:  Okay.  So you're saying that in the
9    original plea agreement the total loss amount was used and
10   that's why I had that higher guideline range that we just
11   talked about, but that you believe that what was directly
12   foreseeable to Mr. Adams was between the 1.5 million and the
13   3.5 million, and that's why we come up with the total offense
14   level of 28 instead of 30.  And that's why we come up with the
15   guideline range for Counts 1 and 2, 87 to 108, and if you add
16   on the 24 months to the 87 and the 24 months to the 208, that's
17   where you come up to the 111 to 132.  Is that correct?
18             MR. PARTICKA:  All of that is correct, Your Honor.
19             THE COURT:  All right.  Do you agree with that,
20   Mr. Swor?
21             MR. SWOR:  Yes, Your Honor.  I mean -- yes.  For
22   purposes of this conversation, yes.
23             THE COURT:  Okay.  Well, the reason that I'm asking
24   that is that I wanted to ask you, Mr. Swor and Mr. Adams, do
25   you want me to accept that plea agreement that you entered into
```

1   when you pled guilty?

2          MR. SWOR:  Yes, Your Honor.

3          THE COURT:  And, Mr. Adams, do you agree with that as

4   well?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  All right.  Well, I will accept that plea

7   agreement then with the understanding, however, that the

8   parties are agreeing that the guideline range that the Court

9   should apply is actually lower than that guideline range that's

10  in the plea agreement.  And so I will consider myself limited

11  to the top of that guideline range that the parties have agreed

12  to even though it's lower than what's in the presentence

13  report.

14         All right.  And so that covers going over what you

15  pled guilty to and what your maximum possible penalties are at

16  least with respect to the guidelines.  There is a statutory

17  maximum for that Count 1 and 2 which is up to 20 years as to

18  Count 1 and 2.  Count 1 has a maximum fine of $250,000, and

19  Count 2 has a maximum fine of $500,000.  And then those

20  aggravated identity theft counts, as we already talked about,

21  they have a mandatory minimum of two years that must be

22  consecutive to any other sentence, and they have a $250,000

23  fine maximum.

24         So, I said before, Mr. Adams, that I have to consider

25  certain factors and that's because of a federal statute that

1   governs sentencing, and I wanted to make sure you knew what

2   those factors were that I needed to consider.  I have to

3   consider the nature and circumstances of the crime; in other

4   words, what kind of a crime it is and all the surrounding facts

5   about the crime.  I have to consider the need for the sentence

6   to reflect the seriousness of the offense and also promote

7   respect for law and provide for a just punishment.  I also need

8   to consider a sentence that will afford proper deterrence, and

9   by deterrence what we mean is discouraging people from

10  committing crimes.  I also have to consider the need to avoid

11  what we call unwarranted sentencing disparities, and that means

12  we need to try to treat similarly situated defendants in a

13  similar way.

14          I also need to consider those sentencing guidelines

15  that we already mentioned.  Those guidelines are not mandatory,

16  but they are advisory.  In other words, the Court must take

17  them into account, but it is not required that the Court impose

18  a sentence within those guidelines.  But they must be

19  considered along with all these other factors, as must the

20  other policies that are in the sentencing guidelines.  And so

21  I'm going to be considering all of these things at the time of

22  sentencing.

23          There's also the issue of restitution which is

24  something that the Court has to consider, and particularly in a

25  case like this, which is a fraud case that does involve a

```
1    considerable loss amount as was just discussed a moment ago, I
2    do have to consider the issue of restitution.  That just means
3    pay the victims back.  I did want to go over the amounts that
4    apply with respect to restitution because although there are
5    amounts in the presentence report, sometimes these amounts need
6    to be brought up-to-date because of new information that's been
7    brought to the attention of the parties, and so let's ask the
8    government to address that issue of restitution.  I know
9    page 22 of the report does have some restitution amounts, but I
10   don't know, Mr. Particka or Mr. Chasteen, would you like to
11   address restitution?
12           MR. PARTICKA:  I will, Your Honor.  Give me one
13   moment.
14           Your Honor, the government would submit that the
15   amounts listed on page 22 of the presentence report are
16   accurate.  It gives a total restitution figure in the amount of
17   $2,343,863.50 broken down as follows:  $336,000 to Wal-Mart,
18   $1,603,478.80 to AT&T, and $404,386.70 to American Express.
19   All of that to be paid jointly and severally with the other
20   defendants in this case.
21           THE COURT:  All right.  And that total amount that you
22   just mentioned, is that in the presentence report too or did
23   you just add that up?
24           MR. PARTICKA:  That total amount I do not believe is
25   listed in the presentence report, Your Honor.  I did take it
```

**SENTENCING**

```
 1   from the government's sentencing memorandum, however, when I
 2   did total it prior to filing that document.
 3              THE COURT:  What is that total again?
 4              MR. PARTICKA:  $2,343,683.50.
 5              THE COURT:  All right.  And so, Mr. Swor, do you agree
 6   with that amount with respect to restitution?
 7              MR. SWOR:  That is the amount in the Rule 11 plea
 8   agreement, Your Honor, and under the calculations in the
 9   agreement that is an accurate calculation.
10              THE COURT:  All right.  Thank you very much.
11              All right.  As I said before then, I will allow the
12   parties to address the Court.  So, Mr. Swor, I'd be happy to
13   hear from you at this time.  I should indicate as well --
14              MR. SWOR:  I'm sorry?
15              THE COURT:  Just so Mr. Adams knows, so, Mr. Adams,
16   your attorney filed a detailed sentencing memorandum in this
17   case that ran more than 20 pages and he also attached a number
18   of exhibits to that, some legal articles, some letters from
19   supporters and family of yours and a number of other
20   attachments and exhibits, and I did read all of that.  The
21   government also prepared a sentencing memorandum that I
22   reviewed as well.  So these are the things that I've reviewed
23   in addition to the presentence report.
24              Go ahead, Mr. Swor.
25              MR. SWOR:  Your Honor, first I'd like to acknowledge
```

1   Mr. Adams' family here in the courtroom who are here to show

2   their support and encouragement and their love for Mr. Adams.

3   I'd ask the Court to consider the community's love for him

4   and --

5           THE COURT:  Thank you, Mr. Swor, and certainly the

6   family is welcome, and I do recognize and see that he does have

7   a large number of individuals here in support of his situation,

8   and that certainly is something to his credit.  So you may

9   proceed.

10          MR. SWOR:  Thank you, Your Honor.

11          I'd like to begin my remarks by addressing and

12  correcting, if you will, the recommendation in our sentencing

13  memorandum regarding any length of term of imprisonment of

14  Mr. Adams.  In the sentencing memorandum I requested and

15  recommended a composite sentence of 70 months.  Upon

16  reflection, I believe that sentence is excessive for at least

17  two reasons.  First and foremost, 70 months is based upon my

18  review of what I believe the better sentencing guidelines

19  applicable to the facts of this case.  As I hope I made clear

20  in my sentencing memorandum, I also believe the guidelines no

21  matter how calculated institutionally result in an excessive

22  sentence, one that in and of itself produces a sentence that is

23  more than sufficient and greater than necessary to achieve the

24  goals of sentencing.  I believe a sentence in this case should

25  be below the guidelines.

1    Second, a sentence of 70 months would only be 4 months
2    lower than the sentence imposed upon Aatif Brown who was
3    involved in this kind of conduct much sooner and on a much
4    greater scale than Mr. Adams and would be a sentence much
5    higher than that imposed upon Robert Lodge and Bruce Rembert
6    who were deeply involved in their own criminal conduct in
7    addition to and being identified as part of the conspiracy, the
8    crime that brings Mr. Adams before the Court, but somehow they
9    were allowed to plead guilty to a much lesser framework and
10   receive much more lenient sentencing guideline ranges and
11   sentence recommendations from the government.
12    Finally, Mr. Adams has been on home confinement since
13   June, 2019.  While his performance early on on home confinement
14   was the subject of litigation and tension, he's learned to
15   conform his behavior to the Court's requirements, and as
16   Mr. Harmon in his sentence -- in his memorandum, Mr. Adams is
17   in compliance with this Court's order.  He has, therefore, for
18   all intents and purposes, continued to be incarcerated although
19   at home.  He will not receive credit from the Bureau of Prisons
20   for that time.  This court can, however, can consider that
21   confinement when fashioning a sentence.  Therefore, I now
22   request that the Court impose a composite sentence of no more
23   than 60 months.
24    The prosecution's argument for longer custodial
25   sentence is based upon in large part on the claim that

1    Mr. Adams' crime is existential.  The government claims that

2    the credit card fraud affects not only the account holders but

3    all of society.  The prosecution argument posits unnamed,

4    unidentified, and theoretical victims.  In the case before the

5    Court the government has identified only three victims:

6    Wal-Mart, AmEx, and AT&T.  But the government and probation

7    imposed more -- a more-than-ten-victim enhancement without

8    identifying any individuals, individual victims, but

9    referencing the guideline annotation and commentary that allows

10   this downstream identification or claim of victims which is one

11   of the arguments for discounting the guidelines that I raised

12   in my memorandum.

13        The government talks about people who suffered money

14   damages and must prove they did not, in fact, make the charges

15   in order to get reimbursed.  There's no evidence of that in

16   this case.  Rather than identify individual victims in this

17   case, we're referenced to a magazine article that talks about,

18   generally speaking, the systemic problem of credit card fraud

19   and credit in the society.

20        Again, the government talks about collateral damage to

21   society and thousands of Michiganders who suffer identity theft

22   each year.  The problem is that has nothing to do with this

23   case, okay?  It is a problem.  It's a systemic problem.  But

24   it's a systemic problem that's part of the credit card society

25   in which we live.  You know, it -- and it goes both ways.  So

1    the fact that it's problematic is not the question before the

2    Court regarding Mr. Adams' sentencing.  It's -- in many ways

3    it's hyperbole, about damaging to society.  And all that

4    hyperbole really does not change the fact that the argument

5    here is based on numbers, and those numbers come from the

6    sentencing guidelines which are roundly and soundly criticized

7    for the fact that the numbers are arbitrary, inconsistent, and

8    subject to manipulation.  As the Court knows, even the American

9    Bar Association's proposed alternatives to the sentencing

10   guidelines.

11         You know, it's interesting that the government raises

12   in its sentencing memorandum the concept of collateral damages

13   because that was an issue that was part of the debate on the

14   guideline rules and the guideline calculations, is whether

15   collateral damages and collateral losses should be included in

16   the guidelines.  Back at the office I came across a 1999 staff

17   paper on the loss tables, and there was a discussion of the

18   place of collateral losses and collateral damages in the

19   guideline calculation, and the decision was mainly collateral

20   damages is a step too far in calculating guidelines because you

21   can -- how far out do you want to go in assessing damages.  You

22   know, it -- in civil law it's too far.

23         So you've read and heard my rants about the loss

24   tables and their, I believe, imperfect and unacceptable place

25   in the sentencing scheme which brings me back to where we

```
 1    started, 18 U.S.C. 3553(a) which attempts to create a human
 2    framework for the imposition of sentences which is regularly
 3    undermined by the fact that the guidelines are such a looming
 4    presence, and for judges, for some judges who have never
 5    practiced in a pre-guideline world, they become the dominating
 6    force.
 7          The statute says that the guidelines are to be
 8    considered not anything else.  The Supreme Court of the United
 9    States instructs that sentencing courts may not presume that
10    the guideline range is a reasonable sentence.  And despite the
11    Supreme Court says there is no thumb on the scale in favor of a
12    guideline sentence -- it's Gall and Kimbrough and Rita -- many
13    courts continue to use the guidelines as a lodestar, and the
14    government continues to use the guidelines as a loadstar.
15          In this case it -- it's very problematic.  This is a
16    serious offense.  We concede that, okay?  We concede that this
17    is a very serious offense.  But the fact is the loss that
18    we've -- my predecessor agreed to, that pretrial services has
19    determined, that the guidelines accept, that the government
20    advocates, is a bit of an accounting ledger to make because
21    when you say loss, what did they really lose?  Well, under the
22    guidelines loss includes -- is the retail price, is the --
23    which they may or may not use, is the commission which they may
24    or may not have made.  Wal-Mart gets to claim a loss and be a
25    victim even though AmEx is also a victim, but AmEx approved the
```

1    charge to Wal-Mart.  So, you know, if we drilled way down, the

2    question might be is AmEx the victim or is Wal-Mart the victim

3    because --

4            THE COURT:  Okay.  Just -- you're not saying there's

5    double counting going on, right?  I think the AmEx loss is

6    separate from the Wal-Mart loss, but we can address that.

7            MR. SWOR:  Well, I mean --

8            THE COURT:  I don't think the loss should be counted

9    twice if that's what's happening here, but I don't think that's

10   what's happening.  But go ahead.

11           MR. SWOR:  That is the appearance of what the

12   guidelines -- and that's the problem with the definition of

13   loss in the guidelines, is the definition of loss in the

14   guidelines allows for all of that.  The definition of loss in

15   the guidelines allows for more than ten victims even though

16   there may be -- because we look at the downstream victims,

17   okay, who may or may not have lost anything.

18           You know, the example in the government's memorandum,

19   the initials identified, American Express never made that

20   person jump through any hoops to dispute that charge.  They

21   would have seen that there was a call-in, their records, so

22   there wouldn't have been the scenario the government describes

23   in its sentencing memorandum because that's just not the way

24   American Express works.

25           So we keep looking at the number.  We keep looking at

1    numbers.  We keep looking at numbers.  We keep looking at

2    numbers.  And the question is numbers become an accounting

3    trick.  You know, when I was -- I'm getting off track here.  My

4    statistics professor used to say they're lies, they're

5    ridiculous lies and then there are statistics, and that becomes

6    the problem with using loss table.  And it distracts from the

7    real question which is what is the harm.  Who was harmed?  What

8    was harmed?  What was done?  What is demonstrable here?

9    Numbers are demonstrable.  They appeared to be objective, but

10   they're not.  A million dollar -- a $1.3 million or $2.3

11   million loss divided between AT&T, Wal-Mart, and American

12   Express, probably a drop in the bucket, not even something that

13   they would claim on their tax returns, doesn't affect their

14   bottom line whatsoever.  But $10,000 from my next-door neighbor

15   who is on Social Security, who has no other income, that's a

16   devastating loss.  But because the number, we assume the harm

17   is greater.

18          3553(a) reminds the Court to look at that, reminds the

19   Court to consider what is the need for the sentence.  Why is it

20   that someone who grew up on the street, who had to learn to get

21   work at nine years old, who was earning his own money bagging

22   groceries, who has hustled his entire life, who committed a

23   crime that is essentially -- it may be thoughtful.  It may

24   be -- it's a crime of opportunity.  You learn about it on

25   YouTube and you execute it, and you execute it better than

```
 1    other people.  I can assure you that Mr. Adams didn't come up
 2    with this scheme by himself.  I can assure you that Mr. Adams
 3    did not devise this technique.  He just learned how to do it,
 4    and because he's a natural hustler and a hard worker, did it,
 5    for lack of a better term, real well.  You know, sometimes it's
 6    not a good idea to be the best.
 7            I wish I didn't have my mask on so you could -- so
 8    what is it about what he has done that makes his sentence
 9    worthy -- or makes him worthy of a sentence substantially
10    greater than the sentence given to the leader of a sex cult who
11    manipulated and imprisoned people for 20 years in the guise of
12    improving their lives who received only a 42-month sentence?
13    What is it about Mr. Adams' conduct that informs the Court that
14    he should be sentenced to a far greater term of imprisonment
15    than a man who over a period of six years managed to steal $126
16    million in real money not accounting money, real money, from
17    businesses and charities and was doing it for decades beyond
18    that six years?  He received only a sentence of 48 months.  Why
19    should Mr. Adams be sentenced to a far greater term of
20    imprisonment than a union official who stole $1.5 million,
21    again, in real money, not accounting money from his union
22    members who received only a 28-month sentence and who was only
23    ordered to pay back one-third of the money he took?
24            There isn't a good answer.  They're all serious
25    crimes.  But what is it about this man that informs the Court,
```

**SENTENCING**

1   his history, his activity, is it about him that warrants a

2   sentence even 70 months, even 60 months?  You know, the fact

3   is -- and please don't take offense, but one fact is he's black

4   and from the streets; they're all white and from the suburbs.

5          I've said all I'm going to say in my sentencing

6   memorandum about that.  Maybe they had something to trade that

7   Mr. Adams doesn't have.  Maybe they're just older and don't

8   have much time left on this earth.  Maybe because he's younger,

9   a longer sentence seems like a lesser sentence.  I don't know.

10  But it's just -- it's not needed, okay?  Say he's a flawed

11  human being.  It appears to be both obvious and an

12  understatement.  But to suggest that that's the reason to

13  sentence him to a lengthy term of imprisonment because he's a

14  hustler is both excessive and unnecessary.

15         His life has shown he's a hard worker.  Looking at the

16  facts of this crime, it's clear he was able to learn, he's

17  smart, and he was able to apply what he learned.

18  Unfortunately, in this case he didn't use his super powers for

19  good.  But he's shown what -- that under the right supervision

20  he can grow and thrive.  Look, he was raw.  He was undersized

21  and underskilled.  But with the right coaching, he ended up

22  leading the league, leading the nation in rebounding.  He

23  initially chafed while on bond and under this Court's

24  supervision and was at risk of going back to pretrial detention

25  and jail.  But with this Court's firm hand, Mr. Harmon's firm

1    hand and the boundary setting, he's shown that he can comply

2    with orders and move forward.

3            It's clear that Mr. Adams needs supervision and

4    direction, but it's also clear that supervision and direction

5    in Mr. Adams' case are just as effective as a long term of

6    punishment.  A triple-digit term of incarceration is not

7    necessary in this case.  A term of 60 months, 36 months on the

8    credit card fraud, 24 months on the identity theft, is

9    sufficient but greater than necessary to fulfill the goals of

10   sentencing.

11           Thank you, Your Honor.

12           THE COURT:  Thank you very much, Mr. Swor.

13           So, Mr. Adams, I'd be happy to hear from you at this

14   time.  And you may come up to the lectern here and you may say

15   whatever you would like to say on your own behalf.

16           THE DEFENDANT:  First, I would just like to apologize

17   to everyone for the mistakes that I have made and things that

18   has taken place.  I learned a great deal over this period of

19   time being on home confinement with my family and just seeing

20   how many people that I'd hurt with making bad decisions.  I'm

21   looking to move forward and bettering myself.

22           THE COURT:  All right.  Thank you very much, sir.

23           All right.  Mr. Particka, on behalf of the government?

24           MR. PARTICKA:  Thank you, Your Honor.

25           I want to start off by addressing what for lack of a

1    better word or amounts to a back door attack on the guidelines

2    that were agreed to in the Rule 11 plea agreement that this

3    Court just accepted.  I am not asking the Court to hold against

4    Mr. Adams the argument of his counsel, but I would like to

5    clarify a few things for the record and for the Court's

6    understanding.

7            When we speak of ten or more victims, we have ten or

8    more victims here.  It is not simply Wal-Mart and AT&T and AmEx

9    although those are the three corporate victims left holding the

10   bag at the end of this.  And I will get to the nature of loss

11   in a moment.  But when it comes to additional victims, we have

12   more than ten subsidiary banks who extended the credit that was

13   ultimately rolled into those loss numbers that Wal-Mart and

14   AmEx are left taking a hit on.  All of those are corporate

15   victims.

16           We have more than ten individual victims.  Whether or

17   not the government has unmasked them and provided their

18   information to the Court or defense counsel or Mr. Adams who

19   likely has forgotten who any of them are to the extent he did

20   know their true names at one point, he himself has admitted

21   that seven of them exist in his plea.  There are seven counts

22   of aggravated identity theft to which Mr. Adams himself pleaded

23   guilty.  Each of those has a last four digits of a credit card

24   number as an identifier.  Each of those credit cards was held

25   by a real person.  Mr. Swor is trying to make this out to be

1    about accounting and just numbers and what is the harm and the

2    government couldn't possibly know that people actually suffered

3    here.  Well, Mr. Adams admits that he stole the personal

4    identifying information of seven people, all seven counts of

5    aggravated identity theft.

6         His co-conspirators admit to even more victims.

7    Counts 4 through 23 of the indictment are all aggravated

8    identity theft.  That's 19 real victims.  So if we're talking

9    about ten or more victims, we certainly have them by the

10   defendant's own admissions within the context of this

11   conspiracy.  That's before we get into any sort of collateral

12   consequences or numbers or anything else that Mr. Swor might

13   want to talk about.

14        But let's get into the nature of loss and harm.  This

15   is about numbers.  It is about a very, very large amount of

16   money that Mr. Adams and his co-conspirators stole, in the

17   millions.  And Mr. Swor would like this to be about the

18   guidelines overstating the harm here, overstating the loss,

19   this being accounting math, not real math, not real money.  The

20   government has already conceded that the guidelines foreseeable

21   to Mr. Adams may have overstated what he did and what he is

22   responsible for, but the restitution number in this case that

23   he agreed to in his plea agreement is over $2 million alone.

24   That's $2 million in real money.  Mr. Swor might say that being

25   able to count commissions on the part of AT&T is unfair and not

1    real loss, but it is real loss to that business.  For every

2    phone that was stolen they had to refund a commission back to

3    Apple who paid them that commission for selling an iPhone.

4    It's real money, Your Honor.  At the end of the day it might be

5    certainly accounted for and moved between one corporate victim

6    and another corporate victim and at the end of the day might

7    not matter very much to Mr. Swor, but it's real money that has

8    a real impact on the economy.

9         And if we pull that down to a micro level and we talk

10   about the actual money, let's just talk about October, 2016.  I

11   addressed this in my sentencing memorandum.  In the span of

12   three days Mr. Adams and a number of his co-conspirators

13   managed to steal $85,000 in actual money, in the form of gift

14   cards that they purchased with fraudulent credit cards which

15   they then liquidated upon their return to Michigan.  It's

16   $85,000.  That's more than the average family makes in an

17   entire year, and they made it in three days.  And then a few

18   weeks later they did it again, and a few weeks later they did

19   it in again and again and again and again in different

20   configurations, in different groups, all across the country,

21   numerous cities, multiple stores in the span of a year again,

22   again, again, again.  That's how we get to that actual number

23   of over a million dollars, and that's just what this crew is

24   willing to acknowledge.

25         From where Wal-Mart sees it and, again, I'm not asking

1    the Court to hold Mr. Adams accountable for things he and his

2    co-conspirators did not do, but from where Wal-Mart sits, this

3    exact scheme, this credit-card-buying-gift-card scheme, has

4    accounted for $10 million in losses to the business during this

5    time frame.  Not all of that is attributable to Mr. Adams and

6    his co-conspirators, but a significant chunk of it is, well

7    over a million dollars.  That's all real money, Your Honor.

8    It's not just accounting.  It is actual money that they stole,

9    and they should be held accountable for what they acknowledge

10   in their own plea agreements to having stolen.

11          Next, I'd like to talk about Mr. Adams because

12   Mr. Swor is right.  The Court is directed to consider at

13   sentencing not only the circumstances of the crime but the

14   history and characteristics of the defendant.  Mr. Swor makes

15   much of this.  He says that Mr. Adams had to learn how to get

16   work at nine years old.  I can't speak to that.  What I can

17   speak to is he did learn to get work.  He had to hustle on the

18   streets.  Can't speak to that.  What I can speak to is he

19   hustled on the basketball court and hustled his way through

20   hard work, grit, and determination for a scholarship and that

21   scholarship allowed him to earn a bachelor's degree which

22   already placed him dramatically ahead of most fraud defendants.

23   Of the vast majority of people who come before this court,

24   period, he has a bachelor's degree.  He knows how to work.  He

25   had a long employment history.  Up until recently he continued

1    to work.  And despite all of that, he, nevertheless, chose to

2    steal a whole lot of money.

3            The internet did not make Mr. Adams do this.  He did

4    not find the devil in the interweb.  That is not something that

5    just happened.  Mr. Swor's argument would like this Court to

6    believe that all of this just sort of happened somehow and

7    nobody's really at fault and nobody was really harmed.  That's

8    not what's going on.  Mr. Adams may have turned to YouTube to

9    find out how to do this.  That might be readily available on

10   the internet.  The Court could do that also.  Government

11   counsel could do that.  We could all learn how to do this in

12   the abstract.  But what we don't do is put into practice to

13   steal real money from the real victims, corporate victims but,

14   nevertheless, real victims.

15           Finally, one more point, Your Honor, as to Mr. Adams'

16   role.  Mr. Swor would ask what makes Mr. Adams different than

17   anyone else in this scheme, and to that the government would

18   note that Mr. Adams had a hand in literally every phase and

19   iteration of this scheme.  He was actively involved in the

20   initial run of the Wal-Mart fraud.  He was very actively

21   involved in the transitional fraud involving AmEx and

22   Co-Defendant Tayan Jackson calling to clear fraud stops on

23   lines.  Mr. Adams was very involved in that, and he was

24   actively involved in the AT&T fraud that was the final phase of

25   this scheme.  Not as involved as some defendants but actively

1    involved.  He played a role at all stages of this scheme.

2         My final point, Your Honor, to address counsel's

3    argument about what makes Mr. Adams any more deserving of a

4    significant sentence than a number of individuals that Mr. Swor

5    pulled from the docket sheet.  Two points.  One, those cases

6    are not before this Court.  The Court is not aware of the

7    things that were considered at that time by those courts.

8         But the second broader point is if anyone were to make

9    an argument for why the guidelines matter and why sentencing

10   inside the guidelines matters, Mr. Swor just did.  He can ask

11   any number of hypothetical questions about why defendant X or Y

12   or Z was entitled to downward departure A or B or C, and it may

13   not seem in either to make sense.  I would venture that some

14   number of the defendants in Mr. Swor's voluminous exhibit

15   received downward departures from the guidelines.  Those are

16   incredibly hard to discern on the back end.  There are reasons.

17   There are reasons that are not known outside the courtroom.

18   There are reasons that are only ever known to the parties and

19   the Court for each and every single one of those sentences,

20   whether it's departure or not.

21        If we are talking about consistency, that's why the

22   guidelines exist.  Mr. Swor can quibble about whether or not

23   they overstate culpability for any fraud offense.  They may.

24   But they are the system that we have, and the more frequently

25   judges sentence within that system the greater degree of

1   consistency we will have in sentencing.  It is ultimately for

2   this Court to decide whether or not a sentence within the

3   guidelines is appropriate here.  I'm not going to try to defend

4   the guideline system as a whole as I stand here.  Within the

5   context of the case, however, the government believes the

6   guidelines are accurate and that Mr. Adams' specific conduct

7   and ongoing involvement for every phase of this scheme merits a

8   sentence at the top of his guidelines.  For all those reasons,

9   Your Honor, we would ask for that sentence.  Thank you.

10          THE COURT:  All right.  Well, thank you very much,

11  Mr. Particka.

12          And so I do need to consider all of those factors that

13  I've previously mentioned here.  So I'm going to go through

14  them now.  The parties have already discussed the sentencing

15  guidelines that apply, so I won't do that until I get to that

16  part of the factors that I need to consider.

17          The first factor I need to consider is the nature and

18  circumstances of the offense.  And so both sides here have

19  acknowledged that this is an extremely serious offense.  This

20  is a large-scale retail fraud organization that was nationwide

21  in scope and operated over several years.  It involved the

22  manufacture of cloned credit cards using stolen personal

23  identity information from hundreds of victims, and this enabled

24  the defendants to make fraudulent credit cards and then go to

25  Wal-Marts around the country.  According to the presentence

1    report and the indictment, Mr. Adams himself traveled to, from

2    what I can count here, five states initially and then two more

3    states, so seven states in order to effectuate this scheme, and

4    the other defendants traveled to as many as over 30 states.

5    And so the scheme was quite far reaching in its scope.

6          The initial scheme involved traveling to Wal-Marts, as

7    I say, in a number of different states, and the presentence

8    report includes the different transactions that are also

9    referenced in the indictment where Mr. Adams would travel to

10   the Wal-Mart usually with one of the other defendants, and some

11   of them were in Virginia, Pennsylvania, in Missouri and Kansas,

12   in North Carolina and later in Arkansas as well.  And the

13   report specifically mentions, for instance, September of 2017

14   when Mr. Adams was working with one of the other co-defendants,

15   two of the other co-defendants, that they were specifically

16   using American Express credit cards, and in some cases the

17   victims who were the real owners of these cards attempted to

18   deactivate them.  And through the effective I guess you might

19   call it social engineering or the talking that the defendants

20   were able to do, they got American Express to reactivate them

21   after they had been deactivated.  And I realize that that's not

22   entirely clear with respect to how many times this happened or

23   how many individuals, but it does show to me the cynicism

24   involved in this kind of a crime and the dishonesty.  Just the

25   real base level of dishonesty involved if you have victims

1   calling to try to deactivate their card because they know

2   someone has used it fraudulently and then that's coming up on

3   their credit card for the defendants to then turn around and

4   convince the credit card company to reactivate it. It just

5   speaks to the nature of the crime here, the nature of the crime

6   being pretty serious with respect to disrespect for law. And

7   that's just the credit card aspect of this.

8          There's also the iPhone scam that went on from 2017 to

9   2018, and that also involved a fairly sophisticated scheme

10  where the defendants would, using personal identity information

11  that was stolen, they would open new service accounts on

12  existing customer accounts and then cause those accounts to

13  purchase iPhones and then they would obtain the iPhones and

14  resell the iPhones. In this case it involved some 1,495

15  separate iPhones. That's a lot of cell phones to sell. That's

16  where it comes up with another $1.4 million in loss.

17         I don't really think there's any debate about the

18  number of victims here, or it's clear that it's more than ten.

19  It's a lot more than ten. I don't really think that that's at

20  issue.

21         The parties have agreed that the property offense

22  level here in terms of the guidelines should be 28 instead of

23  30. That is lower than the parties had calculated at the time

24  of the plea, and it does result in a lower range. As I talked

25  about before, that range is between 87 and 108 months for

1  Counts 1 and 2 but then you have to add on the 24 months for

2  aggravated identity theft, and that's how we get to the range

3  of 111 to 132 months.  The top of that range, 132 months, is

4  essentially 11 years.  The bottom is about nine years.  It's a

5  little more than nine years, but that's the range that we're

6  talking about that applies here which is a very high range.

7  Now, that range is not mandatory, as I mentioned before.  It's

8  an advisory range that the Court has to consider, but the Court

9  is not required to sentence within that range.

10         I do need to consider the defendant's personal

11  characteristics and history as well including if he has any

12  criminal history.  In this case he does have a criminal

13  history.  It's not a particularly serious criminal history, but

14  in looking at it, really from the time he was 19 he had a

15  number of -- what you might call a number of petty offenses,

16  driving without a license and other such offenses.  He does

17  have two of these offenses that occurred when he was 21 and 23,

18  in 2007 and 2009, both of which he used a false name when he

19  was arrested by the officer, and that's a matter of some

20  concern, but the offenses themselves are not particularly

21  serious.  In 2016, when he was 31, he did have a possession of

22  a weapon charge that occurred at the airport, but it wasn't --

23  it did not have a significant penalty associated with it.  He

24  did have in 2017 a financial transaction device fraud case

25  which he got $435 fine for.  I know Mr. Swor includes

32

1    surrounding circumstances of that which he says are mitigating,

2    and that may be true.  I don't really know exactly what there,

3    but it is part of his criminal history.  And the fact that he

4    did not receive any significant penalty for that I think speaks

5    to the fact that he did not take this kind of credit card

6    fraud, you know, seriously.  This happened in 2017.  That was

7    the same -- overlapping with the time frame when he was

8    conducting this much more extensive fraud scheme.

9            I do have to consider Mr. Adams' personal background

10   as well, that he was raised by his mother, that he did have --

11   had a loving family.  Considered his father to be his best

12   friend although his father wasn't particularly involved in his

13   upbringing.  He indicates that essentially he had a life where

14   his basic needs were met.  He has a supportive family.  I note

15   that several of his family members are here today, and that is

16   testimony to the support and love that he has from among his

17   family members.

18           He does have four children.  He is currently married.

19   He has -- the four children are not from the woman he's married

20   to, but there is evidence in the record that he is recognized

21   to be supportive of his children and of their mothers.

22           He has some history of drug abuse involving Percocets

23   but not a serious drug problem.

24           With respect to his education, Mr. Adams has a good

25   record of education, and a record that's something that is

1   definitely to his credit.  It was mentioned by both Mr. Swor
2   and by Mr. Particka that Mr. Adams was able to get a basketball
3   scholarship.  He attended a number of different colleges,
4   community colleges as well as Mississippi Valley State down in
5   Mississippi, and then eventually got his degree from Lindenwood
6   University where he did receive a basketball scholarship in
7   St. Charles, Missouri, and he received a bachelor's degree in
8   criminal justice.
9         He has some employment as well but not a -- but not an
10  extensive employment record.  And so those are the factors that
11  I look at in terms of Mr. Adams' background in the case, and I
12  think his background is one that suggests that he could have
13  gone in a different route than where he did, and it's somewhat
14  of a tragedy that he didn't follow the opportunities he had and
15  instead used the gifts that he has in terms of his abilities,
16  his leadership, his financial ability to pursue a scheme like
17  this instead of possibly trying to get involved in criminal
18  justice or doing the kinds of things I think that even based on
19  his own statements today I think he realizes were the kinds of
20  things that he should have done.
21        I do have to consider the need to impose a sentence
22  that will have sufficient deterrence.  I think the deterrence
23  is important here, and I did listen while Mr. Swor was talking
24  about other fraud cases where individuals may have received
25  sentences that were lower than the guideline range here, and it

1   is true that I can't really consider those cases or speak to

2   those cases because each case needs to be considered on its own

3   facts and based on the circumstances in that case.  And I don't

4   know what happened in those cases.  If anything, from the way

5   Mr. Swor described them, it sounded like some of those

6   defendants should have received higher sentences than what they

7   received from the way he described those cases, but I don't

8   know enough about those cases.

9        I do think that a scheme like this is one that must

10  have a significant custody sentence associated with it because

11  of the seriousness of the crime.  By that I mean a crime that

12  stretched across the entire country, a crime that involved in

13  terms of the scheme up to $10 million, and as to this one

14  defendant, over a million dollars.  And so this is not a small

15  crime.  This is a very big crime, and so deterrence is a

16  significant factor that I need to consider.

17       In terms of protecting the public from other crimes by

18  the defendant, I don't know whether that factor is so

19  important.  I think that, as we've seen, Mr. Adams has been

20  under supervision for some time now during the time while this

21  case has been pending.  He's had a few problems but nothing

22  that suggests that he would get reinvolved in criminal

23  activity.

24       I do need to consider the need to avoid unwarranted

25  sentencing disparities.  We've had one other defendant who was

**SENTENCING**

1 sentenced in this case who received an overall sentence of 96

2 months which is about eight years, and so in comparing the

3 activity of that defendant to the activity of this defendant, I

4 think there are some comparabilities that need to be

5 considered.  Both of them were involved in much of the same

6 parts of this scheme.  At the same time I think that there are

7 positive factors that exist in the record here regarding

8 Mr. Adams.  Some of it I've alluded to.  And that is his -- the

9 education that he's had.  His personal history that shows that

10 he has overcome a lot of difficult circumstances that many

11 people would not have been able to overcome.

12    The government is suggesting that a sentence at the

13 very top of the guideline range should be imposed here, and

14 that would be I think much greater than necessary to accomplish

15 all of these factors that I've just gone over here.  The

16 alternative that Mr. Swor is suggesting of total sentence of 60

17 months, that I think is too small.  I think that that sentence

18 would not be sufficient here, not when we can see that, as I

19 mentioned a moment ago, that the other defendant received a

20 significantly greater sentence.

21    So overall I believe that a sentence on Counts 1 and 2

22 of 60 months would be sufficient and not greater than necessary

23 to accomplish the goals of sentencing, and then that would be

24 followed by a sentence of 24 months on the other aggravated

25 identity theft counts.  So that is the sentence that I intend

**SENTENCING**

1    to impose.  Before I do so, I want to ask the parties if they

2    want to place any objections on the record.

3              MR. PARTICKA:  Nothing for the government, Your Honor.

4              MR. SWOR:  There are no legal impediments to the Court

5    imposing sentence.

6              THE COURT:  I'm sorry.  I couldn't hear you, Mr. Swor.

7              MR. SWOR:  I'm sorry, Your Honor.  There are no legal

8    impediments to the Court imposing sentence.

9              THE COURT:  All right.  Thank you very much.

10             So pursuant to the Sentencing Reform Act of 1984, the

11   Court, considering the sentencing guidelines and factors

12   contained in 18 U.S. Code Section 3553(a), hereby commits the

13   defendant to the custody of U.S. Bureau of Prisons for a term

14   of 60 months on Counts 1 and 2 to run concurrently and 24

15   months on Counts 17 through 23 to run concurrently to each

16   other and consecutive to Counts 1 and 2.  That would be for a

17   total sentence of 84 months.

18             Upon release from imprisonment, the defendant shall be

19   placed on supervised release for a term of three years on

20   Counts 1 and 2 and one year on Counts 17 through 23.  All

21   counts shall run concurrently.  It is further ordered that the

22   defendant shall pay a special assessment of $100 on each count

23   for a total of $900 which will be due immediately.  The Court

24   waives imposition of a fine, costs of incarceration and cost of

25   supervision due to defendant's lack of financial resources.

1    It is further ordered that the defendant shall pay

2    restitution payable to the clerk of the court for disbursement

3    to the victims identified as Wal-Mart in the amount of

4    $336,000, to AT&T in the amount of $1,603,476.80, and to

5    American Express in the amount of $404,386.70.  Restitution

6    shall be ordered joint and several with all co-defendants and

7    interest shall not accrue.

8    While in custody the defendant shall participate in

9    the Inmate Financial Responsibility Program or IFRP.  The Court

10   is aware of the requirements of this program and approves the

11   payment schedules of this program and hereby orders the

12   defendant to participate in that.

13   I will order mandatory drug testing.

14   Pursuant to 34 U.S. Code Section 40702, the defendant

15   shall cooperate with the collection of a DNA sample as directed

16   by the probation officer.

17   While on supervision, the defendant shall abide by the

18   standard conditions as adopted by the U.S. District Court for

19   the Eastern District of Michigan and shall comply with the

20   following special conditions.  Due to the type of the instant

21   offense, the following special conditions are ordered.  Number

22   one, Mr. Adams, you must participate in a cognitive behavior

23   treatment program and follow the rules and regulations of that

24   program.  The probation officer will supervise your

25   participation in the program including all of the aspects of

1    the program such as the provider, location, modality, duration,

2    intensity, et cetera.  Such programs may include group sessions

3    led by a counselor or participation in a program administered

4    by the probation office.

5        You must also submit your person, property, house,

6    residence, vehicle, papers, computers as defined under 18 U.S.

7    Code Section 1030(e)(1) or any electronic communications or

8    data storage devices or media or office to a search conducted

9    by a U.S. probation officer.  Failure to submit to such a

10   search may be grounds for revocation of release.  You must warn

11   any other occupants that the premises where you are may be

12   subject to a search pursuant to this condition.

13       Number three, you must submit your computers as

14   defined previously or any electronic communications or data

15   storage to a search.

16       Based on your past prescription pill use, the

17   following special conditions are ordered.  Number four, you

18   must submit to substance abuse testing to determine if you have

19   used a prohibited substance.

20       Number five, if necessary, you must participate in a

21   substance abuse treatment program and follow the rules and

22   regulations of that program.  Probation officer will also

23   determine your participation and your treatment provider and

24   the location, modality, et cetera of this program.

25       Due to the pending order of restitution, the following

1    special conditions are ordered.  Number six, if the judgment

2    imposes a financial penalty, you must pay the financial penalty

3    in accordance with the schedule of payments with the judgment.

4    You must also notify the court of any changes in economic

5    circumstances that might affect your ability to pay this

6    financial penalty.

7              Number seven, you must provide the probation officer

8    with access to any requested financial information and

9    authorize the release of any financial information.  The

10   probation officer will share any financial information it

11   receives with the U.S. Attorney's Office if requested.

12             Number eight, you must not incur any new credit card

13   charges or open any lines of credit without the approval of the

14   probation officer.

15             Counts 3, 4, and 11 through 16 of the indictment it's

16   my understanding are being sought to be dismissed.  Is that

17   correct?

18             MR. PARTICKA:  Your Honor, I do not believe that

19   Mr. Adams is charged in those counts.  The counts that

20   Mr. Adams is charged in are the counts that he pled to.

21             THE COURT:  All right.  So it may be that those counts

22   are already dismissed.  If he is charged in those counts, then

23   we will have them dismissed.

24             MR. PARTICKA:  Correct.

25             THE COURT:  All right.  Is there anything further?

**SENTENCING**

```
1    Does either party wish to place any objections on the record?
2              MR. PARTICKA:  Not for the government, Your Honor.
3              MR. SWOR:  Your Honor, not with regard to the judgment
4    itself.
5              THE COURT:  All right.  Thank you.
6              So, Mr. Adams, your plea agreement contained what we
7    call a waiver of your appellate rights, and what that indicated
8    was that as long as any sentence that was imposed was no
9    greater than what the plea agreement required, then you would
10   be giving up your right to appeal.  Now, in this case, as we've
11   been talking about it here, the plea agreement had a much
12   higher guideline range in it.  That was the maximum I could
13   impose in the sentence that was just imposed in court.  And so
14   it's likely that if you tried to appeal, you would not be able
15   to do so under that waiver because you gave up your right to
16   appeal under that plea agreement as long as the sentence was
17   within that.
18             Now, if for some reason you think you do have some
19   basis for an appeal, you would need to do so within 14 days of
20   the date that the written judgment is issued.  Do you
21   understand that?
22             THE DEFENDANT:  Yes, Your Honor.
23             THE COURT:  All right.  Is there anything further that
24   we need to address?
25             MR. SWOR:  Your Honor, first of all, initially, we
```

**SENTENCING**

```
 1   would ask the Court to allow Mr. Adams to remain on bond and to

 2   voluntarily surrender to the designated institution.

 3           THE COURT:  Any objection?

 4           MR. PARTICKA:  We don't have any objection to that,

 5   Your Honor.

 6           THE COURT:  All right.  I will then continue bond in

 7   this case, Mr. Adams, and I will allow you to report

 8   voluntarily.

 9           THE DEFENDANT:  Thank you.

10           THE COURT:  So what that means, you'll get a

11   notification from the Bureau of Prisons telling you where

12   you're supposed to report to serve your sentence.  I haven't

13   made any recommendation as to that.

14           I don't know, Mr. Swor, would you like the Court to

15   make any recommendation as to where he should serve his

16   sentence?

17           MR. SWOR:  Your Honor, we would ask the Court to

18   recommend to the Bureau of Prisons that Mr. Adams be housed at

19   FCI Milan or, if that is not available, the next closest

20   facility consistent with his classification, security

21   classification, closest to his family so that he can maintain

22   familial ties, also that -- a facility that has a residential

23   drug abuse program that he can participate in and recommend

24   that he participate in.

25           THE COURT:  All right.  Well, I do recommend that
```

**USA v. ADAMS, 18-20641**

**SENTENCING**

```
 1    Mr. Adams be allowed to serve his sentence at FCI Milan or the
 2    next closest federal correctional institution.  If he is
 3    eligible for the RDAP program, then I recommend that as well as
 4    a drug treatment program that's available in our prison system.
 5            All right.  Anything further?
 6            MR. SWOR:  Finally, Your Honor, Mr. Adams is currently
 7    on unsecured bond with the condition of home confinement.  We
 8    would ask that the Court remove the condition of home
 9    confinement.  He is currently on a GPS tether.  We believe that
10    is sufficient security for his behavior and appearance.  It's
11    six, eight weeks, allow him to have some time with his family
12    before he begins what is an extensive sentence.
13            THE COURT:  What's the government's --
14            MR. SWOR:  I believe he's demonstrated at least in
15    this last year that he can comply with the Court's order and
16    that he can comply with the conditions of supervision.
17            THE COURT:  What's the government's position?
18            MR. PARTICKA:  Your Honor, pretrial services, as I
19    understand it, has recommended that Mr. Adams' conditions
20    continue as they are.  The government would join in that
21    recommendation.
22            THE COURT:  Mr. Swor, do you know why the -- or I
23    guess what makes you say that you believe that he should have
24    this condition removed if pretrial is against it?
25            MR. SWOR:  Your Honor, Mr. Adams has demonstrated that
```

```
 1   he can be responsible, responsive, and follow the rules.
 2   Currently he is in a -- essentially -- not even essentially.
 3   He's in a custodial sentence, and the fact of the matter is is
 4   that all of his violations since being placed on this custodial
 5   sentence has been because there's this inherent tension between
 6   being on bond and being confined.  Pretrial services views this
 7   as being in jail, okay?  And, therefore, it views it as being
 8   the most restrictive as opposed to being on bond with
 9   supervision.  And I think that's the problem and the tension,
10   and that's where we've had problems, is that it's -- there's a
11   dichotomy there.  And I believe pretrial services views itself
12   as a custodial officer as opposed to a supervising officer.
13   And I believe that Mr. Adams has demonstrated that he can
14   function under supervision as opposed to in custody.  You know,
15   he's not gotten credit for being in custody, but he's certainly
16   not had the freedom of being on bond.
17            THE COURT:  Well, the key I think at this point is
18   that Mr. Adams is still subject to a tether; is that correct?
19            MR. SWOR:  Yes, Your Honor.
20            THE COURT:  All right.  Well, I will allow his bond to
21   be amended to allow him to not have the home confinement, but
22   he has to stay on the tether, and -- but I will indicate, you
23   know, Mr. Adams, you didn't get a very good report, all right?
24   So you had some problems with your pretrial services officer.
25            THE DEFENDANT:  Yeah.
```

SENTENCING

```
 1              THE COURT:  And if you get any reports of a problem,
 2   then you're just going to not only be in home confinement, but
 3   I'm just going to revoke your bond and we'll just put you in
 4   detention until it's time for you to report.  Do you understand
 5   that?
 6              THE DEFENDANT:  Yes, Your Honor.
 7              THE COURT:  And so you're basically on a very short
 8   tether here with respect to being allowed to not be on home
 9   confinement.  And so if I get any reports, then it's really not
10   going to be an issue; we are just going to revoke your bond and
11   put you in detention.  Okay?
12              THE DEFENDANT:  Thank you, Your Honor.
13              THE COURT:  Yes, Mr. Particka.
14              MR. PARTICKA:  Your Honor, if I can seek clarification
15   of that last amendment of conditions.  Is it the Court's
16   intention that Mr. Adams be on a tether with curfew?  Is the
17   Court deferring to pretrial services as to hours?  What would
18   the Court like in terms of Mr. Adams' supervision?  Just so the
19   record is clear.
20              THE COURT:  I think that the probation department
21   should determine whether there should be a curfew or not after
22   conferring with Mr. Adams and Mr. Swor.
23              MR. SWOR:  Pretrial services?
24              THE COURT:  Whoever is currently supervising during
25   this period in between.
```

USA v. ADAMS, 18-20641

SENTENCING

1            MR. PARTICKA:  I believe it may actually be the

2     probation department during this time.

3            MR. BELLAMY:  Your Honor, Kody Bellamy on behalf of

4     the probation department.  Mr. Clifford of pretrial services

5     will actually continue to supervise Mr. Adams until he reports.

6            MR. PARTICKA:  Understood.  Thank you.

7            THE COURT:  All right.  Very good.

8            All right.  Is there anything further that we need to

9     address?

10           MR. SWOR:  Nothing further, Your Honor, finally.

11           MR. PARTICKA:  No, Your Honor.  Thank you.

12           THE COURT:  All right.  Thank you very much.  Then we

13    can be adjourned in this matter.  And good luck to you,

14    Mr. Adams.

15           THE DEFENDANT:  Thank you.

16           MR. SWOR:  Thank you, Your Honor.

17           THE COURT CLERK:  Please rise.  Court is in recess.

18       (Proceedings concluded, 3:52 p.m.)

19                          -    -    -

20

21

22

23

24

25

**SENTENCING**

```
 1                        CERTIFICATION OF REPORTER

 2

 3      I, Leann S. Lizza, do hereby certify that the above-entitled

 4   matter was taken before me at the time and place hereinbefore

 5   set forth; that the proceedings were duly recorded by me

 6   stenographically and reduced to computer transcription; that

 7   this is a true, full and correct transcript of my stenographic

 8   notes so taken; and that I am not related to, nor of counsel to

 9   either party, nor interested in the event of this cause.

10

11

12   S/Leann S. Lizza                            1-27-2022

13   Leann S. Lizza, CSR-3746, RPR, CRR, RMR, RDR     Date

14

15

16

17

18

19

20

21

22

23

24

25
```